**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

|  |  |
|---|---|
| PARENTS DEFENDING EDUCATION, | |
| *Plaintiff*, | |
| v. | Case No. _____ |
| WELLESLEY PUBLIC SCHOOLS; DAVID LUSSIER, in his official capacity as Superintendent of Wellesley Public Schools; CHARMAINE CURRY, in her official capacity as Director of Diversity, Equity, and Inclusion for Wellesley Public Schools; JAMIE CHISUM, in his official capacity as Principal of Wellesley High School; MARK ITO, in his official capacity as Principal of Wellesley Middle School. | |
| *Defendants*. | |

**VERIFIED COMPLAINT**

Plaintiff Parents Defending Education ("PDE") brings this complaint against Defendant Wellesley Public Schools ("WPS") and other WPS officials and alleges as follows:

**INTRODUCTION**

1.      Nearly seven decades of Supreme Court precedent have made two things clear: Public schools cannot segregate students by race, and students do not abandon their First Amendment rights at the schoolhouse gate. WPS is flouting both of these principles.

2.      Under the guise of "racial equity," WPS has adopted a policy of segregating students by race. Specifically, WPS sponsors and organizes racial "affinity group" meetings that are open to some students but closed to others, based solely on the races and ethnicities of the students involved. This racial segregation policy violates the Fourteenth Amendment and Title VI of the Civil Rights Act.

3.      WPS has displayed a similar disregard for students' First Amendment rights. WPS has adopted a policy in which it punishes student speech that is "biased," which includes any student speech that is "offensive," has an "impact" on others, "treats another person differently," or "demonstrates conscious or unconscious bias." This speech code violates the First and Fourteenth Amendments and the Massachusetts Students' Freedom of Expression Law.

4.      PDE brings this action to protect students' rights to be free of racial discrimination and their First Amendment rights to freedom of expression.

**PARTIES**

5.      Plaintiff PDE is a nationwide, grassroots membership organization whose mission is to prevent the politicization of K-12 education, including government attempts to force students into divisive identity groups and to silence students who express opposing views. PDE furthers this mission through network and coalition building, disclosure of harmful school policies, advocacy, and, if necessary, litigation.

6.      PDE has members who either send their children to Wellesley public schools or are enrolled in Wellesley public schools.

7.      Defendant WPS is the public school district for Wellesley, Massachusetts. It provides K-12 public education services for more than 4,700 students. WPS operates one preschool, seven elementary schools, one middle school, and one high school.

8.      Defendant David Lussier is the Superintendent of Wellesley Public Schools. Lussier is responsible for the enactment and enforcement of all WPS policies, including the policies challenged here. Lussier is sued in his official capacity.

9.      Defendant Charmaine Curry is the Director of Diversity, Equity, and Inclusion ("DE&I") for WPS. Curry is responsible for WPS policies and programs and "strategic planning

efforts" involving race, sex, and other protected characteristics, including the racial affinity group policy challenged here. Curry is sued in her official capacity.

10.     Defendant Jamie Chisum is the Principal of Wellesley High School. Chisum is responsible for the implementation and enforcement of all policies at Wellesley High School, including the speech codes and affinity group policies challenged here. Chisum is sued in his official capacity.

11.     Defendant Mark Ito is the Principal of Wellesley Middle School. Ito is responsible for the implementation and enforcement of all policies at Wellesley Middle School, including the speech codes and affinity group policies challenged here. Ito is sued in his official capacity.

## JURISDICTION AND VENUE

12.      This action arises under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§1983 and 1988, Title VI of the Civil Rights Act of 1964, and the Massachusetts Students' Freedom of Expression Law.

13.     The Court has subject-matter jurisdiction under 28 U.S.C. §§1331, 1343, and 1367.

14.     Venue is proper under 28 U.S.C. §1391 because WPS resides here and a substantial part of the events or omissions giving rise to the claims occurred here.

## FACTUAL ALLEGATIONS

### I.     WPS's Racial Segregation Through Affinity Groups

#### A.     Racial Segregation and the Rise of Racial Affinity Groups

15.     Nearly seven decades ago, the Supreme Court declared that racial segregation "has no place" in the "field of public education." *Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483, 495 (1954). That is because racial segregation is "inherently unequal," *id.*, and "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people," *Rice v. Cayetano*, 528 U.S. 495, 517 (2000).

16.     But racial segregation is more than unconstitutional. It is "'immoral, . . . inherently wrong, and destructive of democratic society.'" *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 521 (1989) (Scalia, J., concurring in the judgment) (quoting *A Bickel,* The Morality of Consent 133 (1975)).

17.     Treating students "solely as members of a racial group is fundamentally at cross-purposes" with the goal "that students see fellow students as individuals rather than solely as members of a racial group." *Parents Involved in Cmty. Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 733 (2007) (plurality). Racial segregation "demea[ns] the dignity and worth of a person" and teaches children to judge others by their "ancestry instead of by [their] own merit and essential qualities." *Rice*, 528 U.S. at 517.

18.     Simply put, segregating children by the color of their skin "scars the soul of both the segregated and the segregator," and has "always been evil." Martin Luther King, Jr., *Desegregation and the Future*, Address Delivered at the Annual Luncheon of the National Committee for Rural Schools (Dec. 15, 1956).

19.     Despite our nation's long battle against racial segregation, some schools have sought to reintroduce racial segregation in the classroom for the "benign" purposes of "diversity, inclusion, and belonging."

20.     One new and growing approach is the "racial affinity group." A racial affinity group is commonly defined as "a group of people sharing a common race who gather with the intention of finding connection, support, and inspiration." *Racial Affinity Groups: Guide for School Leaders*, Great Schools Partnership, bit.ly/3DDmDl7.

21.     Racial affinity groups, by definition, exclude individuals of certain racial groups. Separating students into same-race groups is essential, proponents believe, because students "benefit from interactions with people who share common identities or experiences" and the presence of students of other races prevents students from "shar[ing] freely and without inhibition about their

experiences." A. Greene, *In Practice: Creating Safe Spaces for Students to Explore Identity*, National Association of Independent Schools (Fall 2020), https://bit.ly/3aGKsw1.

22.     Students are often divided into affinity groups like "Black/African heritage," "Latinx," "Asian," and "white." *Id.* "White affinity groups" are typically "geared toward anti-racist work" and teaching white students to address their "shame, guilt, or sadness." *Id.*

23.     Because racial affinity groups divide children by race, these groups foster racial division and do far more harm than good.

**B.    WPS's Racial Affinity Group Policy**

24.     In 2020, WPS released its "diversity, equity and inclusion" plan for 2020-2025, entitled "WPS Equity Strategic Plan: 2020-2025 School Years."

25.     In the plan, WPS announced its "commitments and ensuing goals" to, among other things, "pursue justice for . . . historically marginalized communities," "continuously examine systems of privilege and bias," "work collectively to disrupt and dismantle inequity in all its forms," and achieve "racial equity." As part of this initiative, WPS announced that it would start promoting and sponsoring "affinity spaces for students with shared identity" in order to "nurture and affirm positive racial identity development."

26.     Under this new policy (the "Racial Affinity Group Policy"), WPS began promoting and sponsoring racial "affinity groups" and "affinity spaces."

27.     By definition and design, the Racial Affinity Group Policy is exclusionary. According to WPS, a racial affinity group is "an opportunity for people within an identity group to openly share their experiences without risk of feeling like they will offend someone from another group, and *without another group's voices*." (emphasis added).

28. The Racial Affinity Group Policy was authorized by Superintendent Lussier, Director Curry, then-Interim Assistant Superintendent for Teaching and Learning Michael LaCava, and Assistant Superintendent for Finance and Operations Cindy Mahr.

29. WPS began implementing its Racial Affinity Group Policy during the 2020-2021 school year.

30. On January 25, 2021, Director Curry emailed the principals of Wellesley Middle School and Wellesley High School (Mark Ito and Jamie Chisum, respectively) to announce an "affinity group" event specifically for "our Black and Brown students" that WPS was planning for early February. Curry asked Ito and Chisum to share information about the event with teachers and staff and to invite only "Black and Brown" students to attend.

31. Director Curry sent a similar email to a Wellesley Middle School teacher, asking her to "shar[e]" information about the event "with [her] Black + Brown students" and "encourage" them to attend. Director Curry later emailed information about the event only to "WPS Students and Alumni of Color," describing the event as a "listening space for Black and Brown students and alumni."

32. WPS did not invite students or parents who did not identify as "black or brown."

33. On February 10, 2021, WPS held an affinity group listening session solely for "black and brown students" to discuss "their reflections on their experiences in the Wellesley Public Schools and Wellesley community and other salient topics related to the current racial climate in our nation."

34. Soon thereafter, WPS began planning another racial affinity group meeting.

35. On March 3, 2021, Director Curry emailed a Wellesley High School administrator to "loop [her] into some planning" for a second racial affinity group meeting. This racial affinity group meeting would be designed "specifically for Asian American students."

36. On March 15, 2021, Director Curry emailed two dozen WPS teachers and administrators, including Principal Ito, to "invite [them] to join" the affinity group session "for Asian

and Asian American students in WPS" scheduled for April 14, 2021. The email informed the teachers and staff that the affinity group meeting was "an initiative of the Office of Diversity, Equity, and Inclusion, created for the purpose of amplifying student voices."

37. Director Curry also emailed a Wellesley Middle School teacher separately to notify her about the racial affinity group meeting. Director Curry described the meeting as solely "for Asian and Asian American students." The teacher responded that she was "very excited that the district will have a space for Asian and Asian American students and families," that Principal Ito had already "emailed the faculty" about the event, and that she would "continue to encourage other staff to share with their Asian and Asian American students."

38. On March 17, Wellesley Middle School teacher Kyle Eichner emailed Director Curry to ask her whether "students and/or families" had already been invited to the event "directly," or whether faculty "need[ed] to tell them about it." Curry replied: "I've shared the email with principals and asked that it be shared with school-based teams." Curry added that she couldn't find a list of students sorted by race so that she could invite only the Asian and Asian American students: "Unfortunately, I don't have access to student/parent emails disaggregated by demographic data to really hone in. So, I'm relying on teaching teams to communicate this opportunity to students directly."

39. Curry also emailed Wellesley Middle School teacher Min Zhou, who she inadvertently excluded from her initial email, informing her about the forthcoming affinity group event. Curry stated that WPS was "excited about this opportunity and hope you can share with your Asian and Asian American students and encourage them to attend."

40. On March 18, following the tragic shooting of Asian Americans in Atlanta, WPS announced that it would be rescheduling the affinity group meeting for later that day. The affinity group would be a "healing session . . . for our Asian and Asian American students and faculty this afternoon."

41.     WPS administrators and teachers repeatedly instructed that the affinity group meeting was *not* for white students. For example, one Wellesley Middle School teacher sent a message to the students in her class notifying them about the event and instructing white students *not* to attend:

> Hi students. Today, our WPS Office of Diversity, Equity and Inclusion will host a Healing Space for Asian and Asian American students (grades 6-12), faculty/staff, and others in the BIPOC (Black, Indigenous, People of Color) community who wish to process recent events. . . .
>
> *Note: This is a safe space for our Asian/Asian-American and Students of Color, *not* for students who identify only as White. If you identify as White, and need help to process recent events, please know I'm here for you as well as your guidance counselors. If you need to know more about why this is not for White students, please ask me!

42.     Other middle school teachers sent similar messages to their students.

43.     Later that day, a white Wellesley High School teacher received a Zoom link to participate in the event, which was called "Healing Space for Asian and Asian American Community." The teacher emailed Director Curry to ask if she could attend. Curry responded that the white teacher *could not attend* because "we want to hold the space for the Asian and Asian American students and faculty/staff. I hope this makes sense." Other high school teachers received a similar message.

44.     The day after the event, several parents of WPS elementary, middle, and high-school students contacted WPS teachers and administrators, expressing outrage that WPS had excluded students from school-sponsored events based on their race.

45.     In response to these complaints and others, WPS issued a district-wide statement vigorously defending its Racial Affinity Group Policy. WPS acknowledged that it had held an affinity group only "for Asian and Asian American students in grades 6-12." Yet WPS said that it "unequivocally affirm[ed] the importance of 'affinity spaces,' where members of historically-marginalized groups can come together in a spirit of mutual support and understanding of shared experiences." WPS promised to continue creating racial affinity groups because "[h]osting affinity

spaces is part of a long-term, evidence-based district strategy that amplifies student and faculty voices on various issues, and enhances their sense of belonging."

46.     Despite WPS's commitment to using affinity groups to support "historically marginalized" groups, the policy appears to apply only to certain minority groups. In response to the Racial Affinity Group Policy, parents asked WPS whether it intended to create affinity groups for Jewish students, a "historically marginalized" people, in the wake of public acts of antisemitic violence and discrimination. WPS refused to create such a group.

47.     The Racial Affinity Group Policy is emblematic of WPS's approach to issues of race in general. This summer, for example, an official WPS twitter account linked to an article suggesting schools start thinking about *exclusion*, not inclusion, for diversity initiatives. Quoting the article, WPS tweeted: "This is on point. 'Does inclusion mean including everyone? What about those who have no desire to dismantle systems of oppression and bring equity and social justice to their school system? What if we can't just all get along?' Great questions to ponder for #equity."

48.     Similarly, WPS instructs its faculty and staff to beware of "white fragility," which it defines as "the counterproductive reactions white people have when their assumptions about race are challenged, which serves to maintain racial inequality. White fragility is characterized by emotions such as anger, fear, guilt, and by behaviors including arguing, crying, silence, or walking away from the stress inducing situation."

49.     WPS also encourages parents to have "conversation starters" with their children on topics such as "Teaching 6-Year-Olds About Privilege and Power," "White Fragility," and "The Myth of Racial Colorblindness."

50.     WPS's policies also are playing out in classrooms. For example, in spring 2021, WPS sponsored a presentation at Wellesley High School that told students that supporting law enforcement groups like "Blue Lives Matter" was "associated with white supremacy, far-right nationalism, and

racism" and such support "could be harmful to … BIPOC" students. The presentation asserted that "police started the violence" during summer 2020 protests. The presentation also warned students not to say "all lives matter" or "blue lives matter" because these sayings were a "racist direct push-back against the Black Lives Matter movement" and were not "innocent term[s] that celebrate[] the worth of all humanity." Students were cautioned that the presentation was "to be seen by only the WPS community" and that there would be "no tolerance for sharing" it with others.

51.     WPS has no plans to end the Racial Affinity Group Policy. Indeed, WPS has promised to *expand* the program by creating racial affinity groups for the "parent/caregiver community."

## II.     WPS's Restrictions on "Biased" Speech

### A.     Public School Students and the First Amendment

52.     Public-school students have First Amendment rights, and those rights do not disappear "at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

53.     Because "America's public schools are the nurseries of democracy," students must be free to express their opinions, even if their views are "unpopular." *Mahanoy Area Sch. Dist. v. B. L. by and through Levy*, 141 S. Ct. 2038, 2046 (2021). Protecting unpopular speech in public schools "ensur[es] that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Id.*

54.     Despite these well-established rights, schools often seek to stamp out controversial student expression. Speech codes are the tried-and-true method of suppressing unpopular student speech. They prohibit expression that would otherwise be constitutionally protected. *Spotlight on Speech Codes 2021* at 10, FIRE, https://bit.ly/3aBY4bF.

55.     Speech codes punish students for undesirable categories of speech such as "harassment," "bullying," "hate speech," and "incivility." Because these policies impose vague,

overbroad, content-based (and sometimes viewpoint-based) restrictions on speech, federal courts regularly strike them down. *Id.* at 10, 24; *see also Speech First v. Fenves*, 979 F.3d 319, 338-39 n.17 (5th Cir. 2020) (collecting "a consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague").

56.     In addition to speech codes, some schools are increasingly turning to a new, innovative way to deter disfavored speech—so-called "bias response teams."

57.     Living up to their Orwellian name, bias-response teams encourage students to monitor their peers' speech and report incidents of "bias" to school officials (often anonymously). "Bias" is defined incredibly broadly and covers wide swaths of protected speech; in fact, speech is often labeled "biased" based solely on the listener's subjective reaction to it.

58.     College students, for example, have been reported to bias-response teams for writing a satirical article about "safe spaces," tweeting "#BlackLivesMatter," chalking "Build the Wall" on a sidewalk, and expressing support for Donald Trump. *Bias Response Team Report 2017*, at 15-18, FIRE, bit.ly/2P9iEaj.

59.     Bias-response teams inevitably monitor protected expression and lead to "a surveillance state" where "students and faculty must guard their every utterance for fear of being reported to and investigated by the administration." *Id.* at 28. "[T]he posture taken by many Bias Response Teams," the FIRE study found, "is all too likely to create profound risks to freedom of expression, freedom of association, and academic freedom on campus." *Id.* at 5.

60.     Universities that have employed bias response teams have discovered that they inevitably chill student speech. The University of Northern Colorado, for example, shuttered its bias-response team in 2016, explaining that it had come "at the expense of free speech and academic freedom" and that its so-called "voluntary" processes "made people feel that we were telling them

what they should and shouldn't say." The University of Iowa likewise scrapped its plans to create a bias-response team, citing their "high failure rate" and their tendency to "become almost punitive."

61.     University professors have similarly observed that bias-response teams "result in a troubling silence: Students, staff, and faculty [are] afraid to speak their minds, and individuals or groups [are] able to leverage bias reporting policies to shut down unpopular or minority viewpoints." Jeffrey Snyder & Amna Khalid, *The Rise of "Bias Response Teams" on Campus*, The New Republic (Mar. 30, 2016), https://bit.ly/3n6Kkf8; *see also* Keith Whittington, Free Speech and the Diverse University, 87 Fordham L. Rev. 2453, 2466 (2019) ("[E]fforts [by bias-response teams] to encourage students to anonymously initiate disciplinary proceedings for perceived acts of bias or to shelter themselves from disagreeable ideas are likely to subvert free and open inquiry and invite fears of political favoritism.").

### B.     WPS's Biased Speech Policy

62.     WPS recently adopted a new policy prohibiting students from committing "bias incidents" (the "Biased Speech Policy").

63.     Under the policy, WPS defines a "bias incident" to be "conduct, speech or expression" that "has an impact but may not involve criminal action" and "demonstrates conscious or unconscious bias that targets individuals or groups that are part of a federally protected class (i.e., race, ethnicity, national origin, sex, gender identity or expression, sexual orientation, religion, or disability)."

64.     A "bias incident" also occurs when "someone treats another person differently or makes an offensive comment because of their membership in a protected group, such as their race, ethnicity, gender, sexual orientation, religion, or disability."

65.     WPS encourages students and parents to be "proactive" and "report incidents of … any concerning pattern of biased behavior" to school authorities.

66.     Complaints about "biased" speech can be filed through an intake form on the WPS website.

67.     Complaints alleging bias incidents "may be made anonymously."

68.     Complainants can report bias incidents based on a wide variety of topics: "Age; Ancestry; Color; Disability status; Genetic information; Gender identity; Marital status; Parental [s]tatus; Political affiliation; Race; Religion; Sex; Sexual Orientation; Veteran status; [or] Other."

69.     Multiple types of speech can qualify as a bias incident, including "Comment in Class," "Comment in Person," "Comment in Writing or on Internet," "Comment via Email/Text," and "Comment via Phone/Voicemail."

70.     When WPS receives a complaint of biased behavior, the complaint is "promptly investigated by a designated official at each school." WPS will also notify the Anti-Defamation League and the Wellesley Police Department, "[w]hen relevant."

71.     Once investigating officials complete their investigations into alleged bias incidents, they fill out a "WPS Bias Investigation Summary Form" outlining their conclusions and explaining whether disciplinary action and/or corrective or remedial actions will be taken.

72.     WPS aims "to complete investigations within 10 days" of receiving a complaint.

73.     If WPS concludes that a student committed a "bias incident," its response "will typically involve the following: Discipline for the person responsible, Remedial or supportive actions to assist those directly impacted, [and/or] Corrective action or education steps for the individual and potentially the school community to ensure that similar events do not happen in the future."

74.     WPS also "document[s]" and preserves "any" complaint alleging a bias incident and "review[s] such data periodically to analyze it for patterns of behavior."

75.     According to WPS, the school district is "proactive about" preventing "incidents of bias" and "works with students and staff at all levels of [its] organization to prevent and address all forms of bias."

76.     To that end, WPS requires every employee to complete a "mandatory training" on how to recognize biased incidents. The assessment trains teachers to identify "bias incidents" and "equity violations," such as "microaggressions." WPS defines "microaggressions" as "everyday slights that communicate hostility towards a group," are "a threat to inclusion in the classroom and the workplace," and "[c]an be committed without intent." "All employees" have an "obligation to report a bias incident against a student."

77.     WPS's definition of "biased" speech is broad enough to include everyday expressions. Students who use words like "normal" and "regular" to "refer to one person or way of life as opposed to another" also engage in "biased" speech because they "perpetuate[] hegemony." And using words like "forefathers, mankind, and businessman" exhibits bias because the words "deny the contributions (even the existence) of females."

78.     For another example, a student's speech is "biased" when he or she describes founding-era Native American tribes "as 'roaming,' 'wandering' or 'roving' across the land" because "[s]uch language implicitly justifies the seizure of Native lands by 'more goal-directed' white Americans who 'traveled' or 'settled' their way westward."

79.     WPS enforces the Biased Speech Policy on- and off-campus. At the beginning of the 2021-2022 school year, Wellesley High School principal Chisum sent a letter to WPS families regarding a "biased-based incident" involving anonymous posts by a student on a social media site. The letter stated that "there is no place for bias-based speech anywhere" and that the school had "already moved forward with consequences for the offense."

80.     Unsurprisingly, the Biased Speech Policy's overbroad, vague restrictions on student speech have been weaponized by certain students to punish classmates who express unpopular views.

81.     For example, a middle-school student who is the child of one of PDE's members stopped speaking in class after watching other students repeatedly report their classmates to WPS

authorities for engaging in "biased" speech when they shared their political beliefs. The student was, in their own words, "shamed into silence" by the policy because "if you're not in full agreement with what the teachers and most students think, you get a target on your back." After watching the student lose "all self-confidence and self-esteem" over the course of the 2020-2021 school year due to the Biased Speech Policy, the student's parents decided to withdraw from Wellesley schools altogether and to incur the cost of private school instead.

82.     WPS's promotion of certain viewpoints and censorship of others is well known. In recent years, WPS administrators have publicly expressed support for student body protests about contentious political issues and intimidated students who chose not to participate.

83.     On April 2, 2019, for example, Wellesley High School students, with the support of WPS teachers, staged a "walkout" during the middle of the school day to protest "the ingrained biases that are in the school system and the community of Wellesley."  Hundreds of students and numerous teachers engaged in the protest, which involved a "sit-in" inside the school and then chants and speeches on the athletic field outside. During the event, the protesting students yelled at non-participating students and threw crumpled-up leaflets about the event at them. One teacher, in particular, glared at a group of nonparticipating students and slammed an event flyer in front of them.

84.     The walkout event was not an isolated incident. In May 2021, WPS began displaying Black Lives Matter ("BLM") flags outside of several Wellesley schools, including Wellesley High School, Wellesley Middle School, and multiple elementary schools. In response, a group of WPS parents, who disagreed with BLM's campaign to defund law enforcement and its condemnation of Israel, sought an opportunity to advocate opposing viewpoints. The group—which included members of Wellesley's Jewish community—asked WPS to display Israeli flags and "Thin Blue Line" flags alongside the BLM flags to show solidarity with WPS's Jewish students, affirm Israel's right to exist, and express support for law enforcement. The parents emphasized that they were not calling for the

removal of the BLM flags—they merely asked for the same opportunity to communicate their ideas that the school had afforded to BLM supporters. WPS refused the request.

85.     WPS has also refused students' requests to present a response to the WPS-approved, schoolwide student presentation describing support for law enforcement as "racist."

86.     On June 10, 2021, more than fifty parents signed an open letter in the local paper criticizing WPS for "forgo[ing] neutrality on political issues" and "choos[ing] sides" in matters of public debate by "support[ing] some political causes over others."

## III.   PDE's Members and This Litigation

87.     PDE has members who either send their children to Wellesley public schools or attend Wellesley public schools.

88.     Parents A, B, C, D, and E are members of PDE.

89.     Parent A and Parent B have a child who currently attends Wellesley High School and a child who formerly attended Wellesley Middle School.  Parent A and B's children attended Wellesley Middle School and Wellesley High School when WPS held the February 2021 and March 2021 affinity group events.

90.     The Affinity Group Policy has harmed Parent A and B's children by making them highly conscious of race during their interactions with their teachers and fellow classmates and making them feel like they were part of the "problem" solely because of their skin color.

91.     Parent A and B's children have repeatedly told them that they want to go to school in an environment that does not categorize them—and their classmates—based on race.

92.     Parents A and B want their children to have the opportunity to attend, to participate in, and to learn from all school-sponsored events, regardless of race. Parents A and B believe that their children—and all WPS-enrolled children—have the legal right to do so.

93.     Parent A and Parent B's children have also been harmed by WPS's Biased Speech Policy.

94.     Parent A and Parent B's younger child attended Wellesley Middle School for the 2020-21 school year. Parent A and Parent B's younger child was afraid to share their beliefs and opinions in class because they feared that they would be reported—and potentially punished—for engaging in "biased" speech. Their younger child's classmates regularly reported their peers to school authorities for expressing "biased" speech under the Speech Policy. According to their younger child, these students used the Speech Policy to "police the class" for unpopular beliefs that differed from the political orthodoxy of the student body.

95.     Parent A and B's younger child eventually stopped participating in class discussions altogether to avoid being reported to WPS administrators for "biased" speech. Their child felt "shamed into silence" by fellow students' use of the Speech Policy. According to Parents A and B, their child lost all "self-esteem and self-confidence" over the course of the school year after self-censoring due to the Biased Speech Policy.

96.     Parent A and B's high-school aged child also self-censors in class out of fear of getting into trouble. Their child has strong views on issues of public policy, including gender identity and the Black Lives Matter organization, and wants to speak passionately and repeatedly about these issues when they are discussed in class.

97.     After seeing other students reported for expressing the "wrong" beliefs under the Biased Speech Policy, however, their child fears that teachers or other students will consider viewpoints other than their own to be "biased" and report their child for the child's speech. As a result, the student remains silent.

98.     Parent C has two children who attend Wellesley High School (the oldest of whom is also a member of PDE) and one child who attends Wellesley Middle School.

99.     The Affinity Group Policy has harmed Parent C's children by excluding them from school-sponsored events that are open to their classmates, solely because of their race.

100.     Parent C's children disagree with the Affinity Group Policy and wish to attend a school that does not separate students based on race. Parent C's children believe that the Affinity Group Policy "make[s] everything about race" and "just emphasize[s] how we're not the same."

101.     Parent C wants their children to have the opportunity to attend, to participate in, and to learn from all school-sponsored events, regardless of race, and believes that their children—and all WPS-enrolled children—have the legal right to do so.

102.     Parent C's children have also been harmed by WPS's Biased Speech Policy.

103.     Parent C's children have strong opinions about many of the most hotly debated topics of the day, including abortion, affirmative action, and allowing biological males who identify as female to compete in women's sports. They do not express their opinions in class or online, however, because they are afraid that they will be punished under the Biased Speech Policy if they do. Parent C's children worry that speaking freely in class could lead to formal discipline and negatively affect their college prospects. One of Parent C's children does not participate in class at all, unless called upon by a teacher.

104.     When Parent C's children do participate in class, they feel that they have no choice except to tell their teachers what they want to hear.

105.     Parent C's children's fears of speaking freely are informed by their years of personal experience with the WPS system. For example, a Wellesley Middle School teacher held one of Parent C's children after class simply because Parent C's child mentioned that Parent C is a conservative. The teacher then lectured Parent C's child about why Parent C's political beliefs could or should change. One of Parent C's children was also physically assaulted in a school hallway by classmates after the assailants discovered that Parent C had voted for Donald Trump in the presidential election. When

Parent C's child reported this incident to a guidance counselor, the counselor told Parent C's child to consider the perspectives of the perpetrators because they were minority students.

106.     The classmates of one of Parent C's children at Wellesley High School routinely yell at and berate a fellow student whenever the student expresses conservative beliefs or speaks in support of Republican politicians. The students' teacher is present while this occurs but does not intervene and appears to agree with the aggressor students.

107.     Parents D and E have a child who is enrolled in a WPS elementary school. Parents D and E intend to send their child to Wellesley Middle School and eventually to Wellesley High School.

108.     Parents D and E want their child to have the opportunity to attend, to participate in, and to learn from all school-sponsored events, regardless of race, and believe that their child—and all WPS-enrolled children—has the legal right to do so.

109.     Parents D and E also oppose WPS's Biased Speech Policy. They believe that the policy creates a circumstance where their child will have no choice but to self-censor out of fear of punishment, both now and in the future.

110.     Parents A-E and their children wish to remain anonymous because they fear retaliation from WPS teachers, WPS administrators, and members of the Wellesley community if their identities are publicized.

111.     Parents A-E have repeatedly reached out to WPS teachers and administrators over the last several months to highlight their concerns with WPS's Affinity Group Policy and Speech Policy, but their concerns have been ignored and WPS's policies remain unchanged.

**COUNT I**
**(Racial Affinity Group Policy)**
**Violation of the Fourteenth Amendment**

112.     Plaintiff repeats and realleges each of the prior allegations in this complaint.

113.    The Fourteenth Amendment's Equal Protection Clause prohibits the government from "deny[ing] to any person the equal protection of the laws." U.S. Const. amend. XIV, §1.

114.    The "central mandate" of equal protection is "racial neutrality" by the government. *Miller v. Johnson*, 515 U.S. 900, 904 (1995). "Whenever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229-30 (2000).

115.    "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." *Fisher v. Univ. of Texas at Austin*, 133 S. Ct. 2411, 2419 (2013) (cleaned up). Thus, "any official action that treats a person differently on account of race or ethnic origin is inherently suspect." *Id.*

116.    "[A]ll racial classifications . . . must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227. The Supreme Court has "insisted on strict scrutiny in every context, even for so-called 'benign' racial classifications." *Johnson v. California*, 543 U.S. 499, 505 (2005).

117.    Strict scrutiny is required because "[r]acial classifications raise special fears that they are motivated by an invidious purpose." *Id.*  "Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining . . . what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics." *Id.* (citation omitted).

118.    Courts therefore "apply strict scrutiny to *all* racial classifications to smoke out illegitimate uses of race by assuring that government is pursuing a goal important enough to warrant use of a highly suspect tool." *Id.* (cleaned up) (emphasis in original).

119.    Strict scrutiny is a "searching examination, and it is the government that bears the burden to prove that the reasons for any racial classification are clearly identified and unquestionably legitimate." *Fisher*, 133 S. Ct. at 2419 (cleaned up). Under strict scrutiny, "the government has the

burden of proving that racial classifications are 'narrowly tailored measures that further compelling governmental interests.'" *Johnson*, 543 U.S. at 505 (quoting *Adarand Constructors, Inc.*, 515 U.S. at 227).

120.    Federal civil rights law states that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. §1983.

121.    Local government bodies, like WPS, are "persons" for the purposes of 42 U.S.C. §1983 and therefore may be sued under federal law for violations of constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). They can be held liable under Section 1983 "for actions taken pursuant to an official policy or an official custom that violated the Constitution." *Walden v. City of Providence, R.I.*, 596 F.3d 38, 55 (1st Cir. 2010).

122.    A plaintiff can establish an official policy or custom by showing "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) that the constitutional injury was caused by a person with final policy making authority." *Doe v. City of Worcester*, 2012 WL 13191288, at *8 n.16 (D. Mass. Feb. 24, 2012) (cleaned up).

123.    Here, WPS has a policy and custom (the "Racial Affinity Group Policy") of segregating students by race through "affinity groups."

124.    Under this Policy, Wellesley schools create affinity groups where only students of certain races are invited to and allowed to join and participate in the group's activities.

125.    Put differently, certain Wellesley students (including the children of PDE's members) are prohibited from participating in certain school activities because of their race and ethnicity.

126.     WPS is acting pursuant to a "policy" or "custom" within the meaning of Section 1983 because, *inter alia*, (1) the Racial Affinity Group Policy is an express policy that, when enforced, causes a constitutional deprivation; (2) separating students by race in WPS schools is a widespread practice that is permanent and well settled; and (3) the Racial Affinity Group Policy was caused by individuals with final policy making authority.

127.     Because WPS uses racial classifications and treats students differently based on their race, the school district's actions and policies are subject to strict scrutiny.

128.     WPS cannot show a compelling interest for its Racial Affinity Group Policy because racial segregation in schools never serves a compelling interest. Indeed, the Supreme Court "rejected the notion that separate can ever be equal—or 'neutral'—[nearly 70] years ago in *Brown v. Board of Education*." *Johnson*, 543 U.S. at 506.

129.     WPS believes that racial affinity groups create spaces "where members of historically-marginalized groups can come together in a spirit of mutual support and understanding of shared experiences." But a "generalized assertion that there has been past discrimination" cannot serve as a compelling interest for present racial classifications. *J.A. Croson Co.*, 488 U.S. at 498.

130.     The Racial Affinity Group Policy also is not narrowly tailored because, among other reasons, there is no evidence that WPS "considered methods other than explicit racial classifications to achieve [its] stated goals." *Parents Involved in Cmty. Sch.*, 551 U.S. at 704. Nor can WPS show "the most exact connection between [its] justification and classification." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 (1986).

131.     WPS has acted and is continuing to act "under color of state law" within the meaning of Section 1983.

## COUNT II
### (Racial Affinity Group Policy)
### Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d et seq.

132.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

133.    Title VI of the Civil Rights Act of 1964 provides that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d.

134.    Local school districts that receive federal funds are subject to Title VI's prohibitions. *See* 42 U.S.C. §2000d-4a; *see, e.g., Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655 (2d Cir. 2012).

135.    Private individuals may sue to enforce Title VI and obtain both injunctive relief and damages. *See Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).

136.    WPS receives federal financial assistance and therefore is subject to Title VI's prohibitions.

137.    Through its Racial Affinity Group Policy, WPS has caused and will continue to cause students to be "excluded from participation in, be denied the benefits of, [and] be subjected to discrimination under" programs and activities offered by WPS "on the ground of race, color, or national origin." 42 U.S.C. §2000d.

138.    In addition, because WPS is violating the Equal Protection Clause of the Fourteenth Amendment, WPS is also violating Title VI. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 980 F.3d 157, 185 (1st Cir. 2020) ("Title VI's protections are coextensive with the Equal Protection Clause of the Fourteenth Amendment.").

## COUNT III
### (Biased Speech Policy)
### Violation of the First Amendment

139.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

140.    The First Amendment prohibits the government from "abridging the freedom of speech." U.S. Const., amend. I.

141.    The Supreme Court has repeatedly "made clear that students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Mahanoy Area Sch. Dist.*, 141 S. Ct. at 2044 (quoting *Tinker*, 393 U.S. at 506).

142.    Although "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986), the exceptions are narrow and limited.

143.    There are "three specific categories of student speech" that schools may regulate in "certain circumstances": "(1) 'indecent,' 'lewd,' or 'vulgar' speech uttered during a school assembly on school grounds, *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986); (2) speech, uttered during a class trip, that promotes 'illegal drug use,' *see Morse v. Frederick*, 551 U.S. 393, 409 (2007); and (3) speech that others may reasonably perceive as 'bear[ing] the imprimatur of the school,' such as that appearing in a school-sponsored newspaper, *see Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988)." *Mahanoy Area Sch. Dist.*, 141 S. Ct. at 2045; *see also Norris on behalf of A.M. v. Cape Elizabeth Sch. District*, 969 F.3d 12 (1st Cir. 2020) (same).

144.    Under *Tinker*, schools may restrict student speech when "(1) actual 'disturbances or disorders on the school premises in fact occur'; (2) 'the record demonstrates facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities'; or (3) the speech invades the rights of others." *Norris*, 969 F.3d at 25 (quoting *Tinker*, 393 U.S. at 513-14) (alterations omitted); *see Mahanoy Area Sch. Dist.*, 141 S. Ct. at 2045 (same).

145.    Importantly, "'undifferentiated fear or apprehension of disturbance is not enough to overcome the right of freedom of express.'" *Norris*, 969 F.3d at 25 (quoting *Tinker*, 393 U.S. at 508). Nor can "a school . . . suppress speech simply because it is unpopular." *Id.*

146.    Moreover, when a student's speech is made off campus, a school's ability to punish that speech is even more "diminish[ed]." *Mahanoy*, 141 S. Ct. at 2046.

147.    Because of the importance of the First Amendment values at stake, school officials bear the burden of justifying any restrictions on student speech. *Norris*, 969 F.3d at 27.

148.    The Supreme Court has consistently recognized the "substantial and expansive threats to free expression posed by content-based restrictions." *United States v. Alvarez*, 567 U.S. 709, 717 (2012). "Content-based regulations" are "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Accordingly, "any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).

149.    "The First Amendment's hostility to content-based regulation extends" to "restrictions on particular viewpoints." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015). Policies cannot "suppress disfavored speech." *Id.* at 2229. Viewpoint discrimination is flatly prohibited. *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019).

150.    Here, WPS has adopted a policy (the "Biased Speech Policy") that disciplines students for the content and viewpoint of their speech.

151.    Specifically, the Policy prohibits "speech or expression" that "demonstrates conscious or unconscious bias that targets individuals or groups" based on certain personal characteristics like race, ethnicity, or gender. The Policy also prohibits speech or expression that "treats another person differently" or amounts to an "offensive comment" about issues like "race, ethnicity, gender, sexual orientation, religion, or disability."

152.    WPS has no compelling interest in suppressing this speech, and, even if it did, its restrictions are not narrowly tailored to further that interest.

153.    The First Amendment also prohibits schools from adopting regulations of students that are "so broad as to chill the exercise of free speech and expression." *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995). "Because First Amendment freedoms need breathing space to survive," the government "may regulate in the area only with narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). Schools must carefully craft their regulations "to punish only unprotected speech and not be susceptible of application to protected expression." *Id.*

154.    The Biased Speech Policy also is unconstitutionally overbroad. By its terms, the policy applies to protected speech. And virtually any opinion or political belief—as well as any use of humor, satire, or parody—could be perceived as "offensive," having an "impact" on others, "treat[ing] another person differently," or "demonstrat[ing] conscious or unconscious bias that targets individuals or groups."

155.    The Biased Speech Policy also does not differentiate between "on campus" and "off campus" speech, even though WPS's ability to punish off-campus speech is extremely limited. *See Mahanoy*, 141 S. Ct. at 2046.

156.    None of the limited exceptions for regulating speech in public schools justify WPS's content-based, viewpoint-based, and overbroad regulation of student speech.

157.    WPS has acted and is continuing to act "under color of state law" for purposes of federal civil rights law. 42 U.S.C. §1983.

### COUNT IV
### (Biased Speech Policy)
### Violation of the First and Fourteenth Amendments
### Void for Vagueness

158.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

159.    "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[T]he vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide

standards for enforcement [by officials]." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007).

160.    With respect to the first goal, a regulation "which either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925)). "With respect to the second goal, . . . 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [officials] for resolution on an ad hoc and subjective basis.'" *Id.* at 551 (quoting *Grayned*, 408 U.S. at 108-09).

161.    This principle of clarity is especially demanding when First Amendment freedoms are at stake. If the challenged law "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law." *Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959).

162.    The Biased Speech Policy is void for vagueness because it gives students no guidance about what speech is permitted and what speech isn't. The policy doesn't specify what constitutes "offensive" speech, speech that has an "impact" on others, speech that "treats another person differently," or speech that "demonstrates conscious or unconscious bias that targets individuals or groups."

163.    This absence of a clear standard creates a serious risk that the policy will be enforced in an arbitrary manner or will be used to target speech based on the viewpoint of the speaker. *See Coates v. City of Cincinnati*, 402 U.S. 611, 614-15 (1971).

164.    WPS has acted and is continuing to act "under color of state law" for purposes of federal civil rights law. 42 U.S.C. §1983.

## COUNT V
### (Biased Speech Policy)
### Violation of the Massachusetts Students' Freedom of Expression Law

165.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

166.    The Massachusetts Students' Freedom of Expression Law provides: "The right of students to freedom of expression in the public schools of the commonwealth shall not be abridged, provided that such right shall not cause any disruption or disorder within the school. Freedom of expression shall include without limitation, the rights and responsibilities of students, collectively and individually, (a) to express their views through speech and symbols, (b) to write, publish and disseminate their views, (c) to assemble peaceably on school property for the purpose of expressing their opinions." Mass. Gen. Laws ch. 71, §82.

167.    The act's "clear and unambiguous language protects the rights of secondary school students limited only by the requirement that any expression be non-disruptive within the school." *Pyle v. Sch. Comm. of S. Hadley*, 667 N.E.2d 869, 872 (Mass. 1996).

168.    Further, "[t]here is no room in the statute to construe an exception for arguably . . . offensive language absent a showing of disruption within the school." *Id.*

169.    WPS is violating the Massachusetts Students' Freedom of Expression Law because the Biased Speech Policy "abridge[s]" the free-speech rights of WPS students (including the children of PDE's members) and the policy is not justified on the basis of future "disruption or disorder." Mass. Gen. Laws ch. 71, §82.

## PRAYER FOR RELIEF

**WHEREFORE**, PDE respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants and provide the following relief:

A.  A declaratory judgment that Defendants' Racial Affinity Group Policy violates the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964;

B.  A declaratory judgment that Defendants' Biased Speech Policy violates the First and Fourteenth Amendments and the Massachusetts Students' Freedom of Expression Law;

C.  A preliminary injunction barring Defendants from enforcing the Racial Affinity Group Policy or otherwise segregating or separating students based on race, either through the use of "affinity groups" or any other policy;

D.  A preliminary injunction barring Defendants from enforcing the Biased Speech Policy;

E.  A permanent injunction barring Defendants from enforcing the Racial Affinity Group Policy or otherwise segregating or separating students based on race, either through the use of "affinity groups" or any other policy;

F.  A permanent injunction barring Defendants from enforcing the Biased Speech Policy;

G.  Nominal damages in the sum of $1;

H.  Plaintiff's reasonable costs and expenses of this action, including attorneys' fees, per 42 U.S.C. §1988 and all other applicable laws;

I.  All other relief that Plaintiff is entitled to.

Dated:  October 19, 2021                    Respectfully submitted,


                                            _s/ Patrick Strawbridge_

                                            Patrick Strawbridge (BBO #678274)
                                            CONSOVOY MCCARTHY PLLC
                                            Ten Post Office Square
                                            8th Floor South PMB #706
                                            Boston, MA 02109
                                            patrick@consovoymccarthy.com


                                            J. Michael Connolly (_pro hac vice forthcoming_)
                                            Taylor A.R. Meehan (_pro hac vice forthcoming_)*
                                            James F. Hasson (_pro hac vice forthcoming_)
                                            CONSOVOY MCCARTHY PLLC
                                            1600 Wilson Blvd., Ste. 700
                                            Arlington, VA 22209
                                            (703) 243-9423
                                            mike@consovoymccarthy.com
                                            taylor@consovoymccarthy.com
                                            james@consovoymccarthy.com

                                            *_Licensed to practice in Illinois & D.C.; Virginia bar_
                                            _application is pending_

                                            _Counsel for Plaintiff_

## VERIFICATION

I, Nicole Neily, declare as follows:

      1.      I am the President of Parents Defending Education, the plaintiff in this case.

      2.      I have reviewed this complaint.

      3.      For the allegations within my personal knowledge, I believe them all to be true.

      4.      For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited policies and documents and based on my conversations with members of Parents Defending Education, including Parents A, B, C, D, and E.

      5.      I declare under penalty of perjury that the foregoing is true and correct.


Executed on October 19, 2021


Nicole Neily
President of Parents Defending Education